# Simon W. Straus et al., Appellants, v. The National Live Stock Bank of Chicago, Appellee.

## Gen. No. 15,130.

1. VERDICTS—*what essential to set aside.* Held, in this case, that the Appellate Court would be justified in reversing the judgment on the ground of its being contrary to the evidence only in two contingencies: one, that in view of the undisputed or incontestably proven facts the verdict on which it is based cannot be sustained, even on the assumption that the disputed matters of fact were justifiably determined by the jury in favor of the defendant; and the other, one in which two conditions should concur: (a) that the determination of the disputed matters in favor of the defendant was necessary to sustain the verdict; and (b) that the clear weight of the evidence was against such a determination.

2. EVIDENCE—*when telephone conversation not established.* A telephone conversation claimed to have taken place with one whose voice is likewise claimed to have been identified, is not established in the absence of corroborating proof if the party with whom the conversation is so claimed to have taken place denies that it did so take place.

3. DECEIT—*when evidence does not establish. Held,* in this case, that the evidence did not show either negligence or deceit upon the part of a bank to whom drafts had for a long time been daily sent for collection because of the failure of such bank to duly present such drafts to the drawee thereof at his place of business and because such bank held such drafts at the supposed though not at the actual request of such drawee and received payment thereof from one whom it supposed represented the drawee but who was in fact the drawer. The essential duty of a collecting bank being to obtain payment, its failure to disclose the manner in which such drafts were handled and paid did not confer a cause of action, it having acted in good faith and without knowledge of the fraudulent purposes designed by such drawer.

4. NEGLIGENCE—*when recovery cannot be had.* Where the loss of the plaintiff is primarily due to his own neglect, credulity or carelessness, he cannot recover against a defendant who may have been guilty also of some neglect of duty contributing to the result.

Appeal from the Superior Court of Cook county; the HON. HOMER ABBOTT, Judge, presiding. Heard in this court at the October term, 1909. Affirmed. Opinion filed October 5, 1911.

**Statement by the Court.**     The judgment of the Superior Court of Cook county appealed from in this case is one of *nil capiat* and for costs rendered against the plaintiffs below, who are appellants in this court. The parties to the suit will be hereinafter referred to as plaintiffs and defendant, respectively.

The plaintiffs were, at and prior to the transactions which are the cause of this action, mortgage loan and real estate brokers in Chicago, under the style of S. W. Straus & Co.   Their claim against the defendant Bank put in suit in this case was set forth in three counts of a declaration, the *ad damnum* clause of which was $300,000.   The first count alleges that:

*The plaintiffs, Simon W. Straus and Samuel J. Straus, were brokers in Chicago from July 6, 1903, up to October 30th, 1905, and during that period they endorsed and deposited with the First National Bank of Chicago and with Foreman Bros. Banking Company one thousand drafts belonging to them, the plaintiffs, aggregating thirty million of dollars.   These drafts were payable at sight and were drawn by an individual or firm doing business as and under the name of the Union Cotton Seed Company.   Said drafts were drawn on Nelson Morris at the Union Stock Yards in Chicago, where Morris had, during all said time, his office and business.   They were drawn to the order of the Union Cotton Seed Company, the drawer, and endorsed by the "Union Cotton Seed Company."   Each of them had attached to it, when deposited, a statement purporting to be a memorandum indicating a sale of merchandise by the Union Cotton Seed Company to Nelson Morris and an indebtedness to said Company from Morris to the amount of said draft.   The First National Bank of Chicago and Foreman Bros. Banking Company on respectively receiving these drafts and memoranda of sales immediately endorsed the drafts and delivered drafts and memoranda to the defendant, the National Live Stock Bank, which was a corporation at the Union Stock Yards in Chicago, engaged in the banking business, and in conducting said business re-*

ceiving and accepting for collections bills, drafts, checks, etc., from other persons. The First National Bank and Foreman Bros. Banking Co. delivered these drafts and memoranda attached to the defendant, for the purpose of having defendant, for compensation to be paid it, present the same immediately, or within a reasonable time, to Morris for payment, and remit the proceeds to the First National Bank and the Foreman Bros. Banking Company, for the benefit of the plaintiffs.

But the defendant, neglecting its duty, failed to present these drafts and memoranda to Morris or to demand payment of any of the drafts from Morris, but instead, without the knowledge of Morris or of the forwarding Banks, or of the plaintiffs, retained the said drafts and memoranda at its banking office at the Union Stock Yards, and accepted payments of each of said drafts from some person acting not for and in behalf of Morris, but for and in behalf of the Union Cotton Seed Company, and upon so receiving payment surrendered the drafts and memoranda to the persons paying the draft. The defendant thus continuously collected the drafts in this manner and promptly remitted the amounts of them to the banks forwarding them. But although the defendant knew, or ought to have known, during all this time, all these facts, it wrongfully, negligently, wilfully and fraudulently failed to notify the First National Bank or Foreman Bros. Banking Company or the plaintiffs that it had neglected to present the said drafts and memoranda of sales to Morris or to demand payment from him, or that they had been paid to defendant by and surrendered by the defendant to some one acting for the Union Cotton Seed Company, but concealed these facts from the said First National Bank and Foreman Bros. Banking Company and from the plaintiffs.

During all said time the defendant knowingly, falsely and fraudulently represented and pretended to said First National Bank and said Foreman Bros. Banking Company and the plaintiffs, respectively, and intended to and did induce them to believe that the

*Union Cotton Seed Company was, during all said time, selling merchandise to Nelson Morris to the extent and amounts indicated in the memoranda of sales and represented by the drafts, and had business dealings with Morris which entitled it to draw the said drafts on Morris, and further falsely and fraudulently represented to the said First National Bank and said Foreman Bros. Banking Co. and the plaintiffs, and intended to and did induce them to believe that said defendant had promptly presented each of the drafts with the memoranda of sales attached to Morris for payment, and that the said drafts had been promptly and regularly paid to said defendant by Morris.*

Morris, during all said time, was a man of great wealth, known to be so by the plaintiffs and the defendant and the forwarding banks and the Union Cotton Seed Company and the public, and known to be engaged in extensive business, including the purchase, use and disposal of merchandise of the character that the said memoranda of sales purported to represent.

While believing the representations of the defendant, before set forth, the plaintiffs, on October 30th and 31st, 1905, purchased from said Union Cotton Seed Company three drafts drawn by the said Company on Nelson Morris, payable at sight to the order of said Company and endorsed in blank by it; one dated Chicago, Oct. 30, 1905, for $85,439.84; a second dated Chicago, Oct. 31, 1905, for $86,693.25; and the third dated Chicago, Oct. 31, 1905, for $80,526.68; each of them having a statement attached purporting to be a memorandum indicating alleged sales of merchandise by said Cotton Seed Company to said Morris and of indebtedness to said Company equal to the amount of said drafts.

On October 30, 1905, the plaintiffs endorsed and deposited the draft for $85,439.84 with the First National Bank of Chicago, together with a memorandum of sales attached therto. On October 31st they endorsed and deposited with Foreman Brothers Banking Company the drafts for $86,693.25 and $80,526.68, with memoranda of sales attached to them, respectively.

Immediately on receipt by said Banks of said three drafts respectively, they endorsed and forwarded to the defendant the same, with memoranda of sales attached, to be by the defendant presented to Morris and collected from Morris, the proceeds to be remitted to the said forwarding banks, respectively, for the benefit of the plaintiffs.

The said three drafts were not, however, taken up or paid by any one, and Morris, although payment was requested of him, refused to pay or accept them, and said drafts remain unpaid. The drawer of said drafts was at the time of the drawing of the same and the delivery of them to the plaintiffs, and still is, insolvent and execution proof, and in consequence the plaintiffs were required to take up and pay the same and did pay the respective amounts thereof to the respective forwarding banks. The entire amount of said drafts, with interest thereon, has thus become and is wholly lost to the plaintiffs.

At the time and prior to the time that the plaintiffs received said drafts, they believed the representations and pretenses of the defendant before described to be true, and relied thereon and believed that Morris was at the time of the drawing of the drafts by the Union Cotton Seed Company and the receipt thereof by the plaintiffs, indebted to said Company to the extent and as indicated on the memoranda of sales attached to the drafts respectively, and but for such belief and reliance would not have purchased any of said drafts or paid any consideration therefor.

*As a matter of fact, as the defendant knew, or by the exercise of ordinary care would have known, but as the plaintiffs first discovered on November 1, 1905, the Union Cotton Seed Company did not at any of the times aforesaid have any business dealings with said Morris, and none of said memoranda of sales was genuine, but each was fictitious and Morris was not indebted at any of said times to said Cotton Seed Company and said Company was not entitled or authorized to draw on said Morris any of said drafts.*

The gist of the complaint against the defendant by the plaintiffs is shown by the words we have italicized, the rest of the count explaining why the alleged "concealments" and "false and fraudulent representations" came to injure the plaintiffs, and the damages resulting therefrom.

The second and third counts describe the same transactions and make in effect the same charge of "negligent" and "wilful" misrepresentation and concealment.

The second count treats the defendant Bank as the direct agent of the plaintiffs for collection of the drafts, and alleges a duty on the part of the defendant to report to the plaintiffs, or their duly authorized agents, omitting all reference to the forwarding banks by name.

The third count varies the statement of the transactions and the alleged grievance by averring that the plaintiffs on becoming by purchase the owners of the drafts drawn prior to October 30, 1905, endorsed and deposited the same with *and received credit for the amount thereof from various Banks in Chicago,* and that thereupon the said Banks forwarded them to the defendant for collection, and that the defendant *wrongfully and negligently* failed to present them to Morris, etc., and "by its wrongful and negligent conduct and concealment," "in substance and in fact represented and gave plaintiffs to understand and believe" and "induced them to believe," that the Cotton Seed Company was selling merchandise to Morris as represented by said memoranda of sales and drafts, and was entitled and authorized to draw on Morris, and that the defendant had presented each of said drafts to and had collected the amount thereof from said Morris, and that in reliance thereon the plaintiffs endorsed and deposited the three last drafts aggregating $252,-659.77 with said Banks in Chicago, and drew checks

against the credit allowed them; that the said three drafts were not paid by Morris or the Union Cotton Seed Company, although they were duly presented to Morris and although payment was demanded of him and of the Cotton Seed Company; in consequence of which and the insolvency of the Cotton Seed Company, the plaintiffs were obliged to take up the said three drafts from "forwarding Banks" where they had been deposited, and lost the entire amount thereof.

A general demurrer to the declaration was filed by the defendant, but it was afterwards withdrawn and the general issue filed. On these pleadings the cause was submitted to a jury under thirteen instructions tendered by the plaintiffs and twelve tendered by the defendant. Several other instructions submitted by the plaintiffs and by the defendant, respectively, were refused, among them an instruction on behalf of the defendant to find the defendant not guilty, offered at the close of the evidence for the plaintiff, and also at the close of all the evidence in the cause.

The following special interrogatories were submitted to the jury at the instance of the defendant:

"I. Do you find from the evidence that the loss sued for by the plaintiffs in this case was due to the arrangement made by them with S. N. Hoffheimer in July, 1903, whereby they agreed to give to S. N. Hoffheimer their checks from day to day without requiring bills of lading or other security therefor?"

The jury returned with their verdict as their answer to this interrogatory, "Yes."

"II. Do you find from the evidence herein that by the exercise of such care and prudence as a reasonably careful and prudent man would have exercised under like circumstances, that the plaintiffs, S. W. Straus & Co., could and should have made inquiry and found out at any time after July, 1903, and before October 31, 1905, whether the supposed transactions in cotton seed meal and hulls, involved herein, were genuine transactions?"

The jury returned as their answer to this interrogatory, "Yes."

"III.   Do you find from the evidence that the alleged daily sales of cotton seed meal and hulls by the Union Cotton Seed Company to Nelson Morris and the drafts and checks in evidence, were so large as to put a reasonably prudent and careful man upon inquiry as to whether said transactions were genuine and bona fide?"

The jury returned as their answer to this interrogatory, "No."

"IV.   Did S. W. Straus & Co. exercise such care as a reasonably prudent person would have exercised under like circumstances when they gave S. N. Hoffheimer their three checks, part of exhibits 6-18 and 19, without making inquiry as to whether the transactions purported to be represented thereby were bona fide transactions?"

The jury returned as their answer to this interrogatory, "No."

The general verdict of the jury found the defendant "Not guilty."

A motion for a new trial and a motion in arrest of judgment were respectively made by the plaintiffs and denied, and the judgment which is herein appealed from entered.

In this court eleven assignments of error have been made by appellants. The first six are allegations that the verdict and judgment, respectively, are contrary to the law and the evidence. The seventh and eighth attack rulings of the trial court on the admission of evidence, the ninth, its instructions on behalf of the defendant, and the tenth its refusal of proposed instructions submitted by the plaintiffs. The eleventh is the proposition that the court erred in overruling the motion of the plaintiffs for a new trial and in entering judgment in favor of the defendant.

MAYER, MEYER, AUSTRIAN & PLATT, for appellants.

WINSTON, PAYNE, STRAWN & SHAW, for appellee; JOHN BARTON PAYNE and M. H. WHITNEY, of counsel.

MR. PRESIDING JUSTICE BROWN delivered the opinion of the court.

Much the larger portion of the material facts involved in this cause are not in dispute between the parties, or are proven by such evidence that we may assume them, for the purposes of this review, to be practically incontestable.

We should be justified in reversing the judgment on the ground of its being contrary to the evidence only in two contingencies—one, that in view of these undisputed or incontestably proven facts, the verdict on which it is based cannot be sustained, even on the assumption that the disputed matters of fact were justifiably determined by the jury in favor of the defendant; and the other, one in which two conditions should concur, (a) that the determination of the disputed matters in favor of the defendant was necessary to sustain the verdict; and, (b), that the clear weight of the evidence was against such a determination.

If neither of these conditions exists we cannot disturb the verdict and judgment on the basis of plaintiffs' contentions over the facts, and shall have only to inquire whether substantial and material error which, in our opinion, could have affected the ultimate result of the litigation has intervened in the trial which we are called on to review.

This last inquiry, in the view which we take of the cause, will be simpler and therefore can be more conveniently made after the questions before noted, involving the effect and weight of the evidence are disposed of. To this disposition a full review of the evidence is necessary.

Nelson Morris in 1902, when the transactions which

Straus v. The Nat. L. S. B'k., 163 Ill. App. 310.

are the subject of this litigation began, was and for many years had been a man of great wealth, engaged in many business enterprises connected with the raising, feeding, shipping, and killing and packing of cattle. He was not only engaged in such business personally and as a member of the firm of Morris & Company, but was the controlling factor in various corporations (some of them with and some without his family name in their title), carrying on their affairs in the same general business headquarters at the Union Stock Yards of Chicago, and called in the testimony, generically, the Morris concerns. He continued in this business and held this interest in the various concerns through which the aggregate of it was done up to and beyond November 1, 1905, when the transactions herein involved culminated. He was known at all times as a very closely figuring, carefully calculating business man. In the course of the enormous business thus done by the Morris concerns a great number of drafts were drawn on them. Every business day, drafts, sometimes as many as fifty, were drawn on one or more of the Morris concerns, and as we read the evidence, any of them may have been refused, or may have been paid by the personal check of Nelson Morris or by the check of any one of the component parts of the Morris "outfit," as it was denominated at some places in the testimony. The usual and customary method of presenting and collecting these drafts by the Banks in the Stock Yards through which they came is important, in connection with the theory on which this suit was brought.

The Drovers Deposit National Bank sent its collection clerk with the drafts on the Morris concerns, together with a list of them, to the office occupied by those concerns in the Exchange Building. This clerk carried, besides, such drafts as the Bank might have received on the other business houses in the same building. He would leave the "Morris" drafts themselves with or for the cashier or draft clerk of Nelson

Morris, one James A. Bell, at about noon, in order that the different departments of the business might be communicated with and a decision reached as to each draft, whether it should be paid, accepted or refused. After the same collection clerk, one Harry P. Gates during the period of the transactions herein involved, had made the round of the other offices in the building, and before the close of banking hours, he would call again on Bell and take from him the rejected drafts and a check or checks for those that were paid, which then were duly surrendered to Bell.

The defendant herein, the National Live Stock Bank, had a slightly different method of collection. Its custom was to send over "the Morris drafts" (that is, the drafts on any of the Morris concerns) which it received on any particular day to the Morris offices during the forenoon and leave them with or on the desk of Bell. Later in the day, before the close of business hours, a messenger from the Morris offices would bring back to the Bank all these drafts. The rejected ones were of course kept by the Bank. For those that were paid a Morris check (the collection clerk of the National Live Stock Bank says it was usually a check of "Nelson Morris per I. Morris") was brought by the messenger with the drafts. These paid drafts were then stamped by the collection teller "paid" and surrendered to the messenger. Divergence, however, from this course in the matter of the particular series of drafts described in the declaration is the occasion of this litigation.

Samuel N. Hoffheimer was the son of a sister of Mrs. Nelson Morris, thus standing by marriage in the relation of nephew to Nelson Morris. In 1879, being then thirteen years old (according to his mother's testimony), he went into the employment of Nelson Morris and in connection with the Morris concerns had occupied important if not confidential positions in the

service of Mr. Morris up to within a comparatively short time before 1902. During 1902, 1903, 1904 and 1905, he was very often in and out of the office of Nelson Morris, almost daily there,—in the idiomatic English phrase, ''a tame cat about the place.'' So constant was he in this attendance that although from the testimony of Edward Morris and others it is quite plain that Hoffheimer was not an employe of Mr. Morris after about 1900, Mr. Bell declined to say more when first interrogated on the subject, than that he did not believe he was so employed in 1903-4 and 5, but did not know. Mr. Francis, who had general supervision of the office and knew that Hoffheimer was not employed there, said that he was there very often, and while he knew that he was there sometimes about the sale of cotton seed meal and hulls, it was impossible to say that he was not transacting other business there, ''the office being very open and people coming in there all the time.''

The fact was, however, that Hoffheimer left the employment of Nelson Morris in or about 1900, and afterward went into business on his own account. One small business he was conducting seems to have been the manufacture or mixture of poultry feed in a loft which he rented; another, the exact date of the beginning of which it is impossible from the evidence to fix, was a larger enterprise, in the manufacture of soap, which is a business in many cases connected with or allied to packing interests. This business developed into the incorporation of a Company called the Hoffheimer Soap Company, which in the Spring of 1905 built a factory. The extent of the business done by this Company, with which the plaintiffs as well as S. N. Hoffheimer were connected, and the amount of money which may have been lost in the enterprise, do not appear; but it does appear that the Company went into bankruptcy immediately on the culmination of the trans-

actions which are the subject of this litigation, that its plant was foreclosed upon, and that its assets were practically worthless. It also appears that between February, 1905, and November, 1905, when the crash came, the Company had built a factory, and enlarged its offices from one room in the Royal Trust Co. Building to four, which it occupied, however, in conjunction with the other enterprises of Hoffheimer, apparently doing a large business and employing in its offices alone a large number of persons, of whom nine besides himself were mentioned by name by one witness, with the statement there were "lots of others."

This is mentioned only with reference to the hypothesis advanced in the argument of the appellee that in the working out of the fraudulent scheme which is hereinafter detailed, Hoffheimer's plan was "to increase the drafts in number and amount to the end that he might obtain a larger sum of money when he had carried the scheme as far as he deemed safe, and elected to keep the proceeds of the checks given him by the plaintiffs and let the drafts go unpaid, or, in the language of the street, 'to unload.'" An alternative hypothesis, quite as probable to our minds, is that the money which he fraudulently procured from the plaintiffs was expended in a failing business, begun, the evidence would seem to indicate, by a financially involved manager on fictitious capital and carried on on a scale which in the case of "a straw" basis like that was certain to invite disaster. If Hoffheimer's motives or intentions were material in this controversy, we should deem it more likely that he was frantically endeavoring to turn some failing collateral undertaking into a successful one through money obtained by his wickedly ingenious scheme, than that through years he was daily increasing the amount involved in his frauds, in the hope of a larger booty at the end.

However this may be, and in the absence of evidence,

Straus v. The Nat. L. S. B'k., 163 Ill. App. 310.

it must be all conjecture,—the transactions herein involved were these: Besides his soap business and chicken feed business, Hoffheimer had apparently from the time of leaving Nelson Morris' service, a comparatively small business in the purchase and resale to Morris, or to the Morris concern, of cotton seed meal and hulls, an important and largely used feed for fattening cattle. Although Nelson Morris was perhaps the largest feeder of cattle in the world, four or five carloads of such meal and hulls a day, or less than one hundred and seventy-five tons, was an outside estimate of his possible consumption. It would seem probable, therefore, from the amount which the evidence shows was actually purchased from or through Hoffheimer, that a considerable part of Morris' supply was obtained through that channel. Hoffheimer was doing this business up to the Fall of 1902 (at least so he told the plaintiffs) in partnership with Mr. Harrington and under the firm name of J. L. Harrington & Co. His representation to the plaintiffs was that this firm had done a good business in selling cotton seed meal and hulls to Nelson Morris and others, that he could buy meal and hulls and sell it all to Nelson Morris at a profit of 25 cents a ton (about 1 per cent on its purchase price) on the meal and 12½ cents a ton (or about two per cent on the purchase price) on the hulls; that he had been giving Bartlett, Frazier & Carrington, a brokerage house with which Harrington had affiliations, 33½ per cent of the profits for financing the business in the way that he proposed to the plaintiffs to do it, but that he was going to disjoin himself from Harrington and cary on the business alone, and would give the plaintiffs 20 per cent of the accruing profits if they would take the place of Bartlett, Frazier & Carrington in the transactions.

The plaintiffs, Simon W. and Samuel J. T. Straus, to whom Hoffheimer made this proposition, were acquainted and connected both with him and the Morrises.

The wife of Samuel Straus, the younger of the plaintiffs, was, like Hoffheimer, a child of a sister of Mrs. Nelson Morris and was therefore a cousin of Hoffheimer and stood by marriage in the relation of a niece to Nelson Morris. She had lived before marriage in the family of the Hoffheimers (with S. N. Hoffheimer and his mother), and Samuel Straus had married her at their house.

Simon W. Straus, the other plaintiff, was a schoolmate of Edward Morris (the son of Nelson), and was socially acquainted with his father and family.

Simon Straus had been in the banking business since his boyhood, having been employed by Lazarus Silverman in his bank before 1884. Then after working for his father in a country bank in Indiana and afterward in Chicago, he went into the banking business for himself in the partnership of Kahn & Straus, which conducted a private banking business in Chicago from 1888 to 1894. After 1894 he was for a year or so in the banking business again with his father under the name of Straus Bros. & Company, a firm which became, on his father's retirement, S. W. Straus & Company, and ceased to do a regular banking business, but busied itself with mortgage loans and investments. As Samuel Straus, who joined his brother in this firm and business in 1899, expressed it in his testimony, "The business was one of making loans on real estate or other investment securities and buying or selling real estate for our own account or on a commission basis, and insurance and like business that goes with that character of business."

It was not unnatural that the proposition thus made by Hoffheimer to the plaintiffs should have been attractive to them. The business seemed to be established. Hoffheimer had the sources of supply and the fixed market for his stock in trade apparently arranged. Moreover, that market apparently had been

fixed by agreement with the prospective buyer at a safe profit over the cost. The arrangement and representation may have been *bona fide,* and Nelson Morris may, in favor of the close connection of his family, in transactions involving $150 perhaps on the average daily (see Record 1016 and 1027) have been willing to allow what would have been in effect a brokerage fee or small profit of a few dollars on each transaction, and it does not seem unreasonable or improbable that he should have been willing, under the same circumstances, to have agreed to such a profit or compensation for Hoffheimer's attention to the business (supposing Hoffheimer to be making his purchases around the country and exercising supervision as to quality), even when these actual transactions grew, as they did between July 3, 1903, and June 18, 1904, and between October 27, 1904, and November 6, 1905 (see Rec. 473 and 542), to an average of something like $400 a day.

The existence of such an arrangement, however, on the part of a man of the close attention to expenditure and of the business sagacity which Mr. Morris is shown by the evidence to have had, if transactions involving $150,000 a day or more were to give a profit of $1,500 daily, for what would have been practically the mere transmission of a bill of lading from the Illinois Central offices to the Stock Yards office of Morris, is far from so conceivable. To the improbability of this we shall allude hereafter.

The plaintiffs undertook to carry out the arrangement proposed to them, and from September, 1902, at least until July 3, 1903, it followed normal business lines. Hoffheimer would make purchases comparatively small in amount, averaging, as we have indicated, perhaps $150 a day, and drafts for the purchases from various dealers in meal and hulls throughout the country, with a bill of lading attached, would be drawn on the Union Cotton Seed Company (under which name the business was conducted) or on Hoffheimer or on

S. W. Straus & Co. (presumably by Hoffheimer's direction) "acc. of S. N. Hoffheimer." In either case the draft would be paid by a check of S. W. Straus & Co. on their bank account in the First National Bank of Chicago or on Foreman Bros. Banking Co. of Chicago, either to the order of the Bank itself or of Hoffheimer or the Union Cotton Seed Co. to be endorsed and handed over by Hoffheimer or otherwise used by him in paying the purchase price. At the same time, at each transaction, drafts on Nelson Morris were drawn in the office of S. W. Straus & Co., signed The Union Cotton Seed Company (a stencil stamp being used for this name), per Charles H. Gekler (in Gekler's hand-writing) for the amount of the selling price, which was the cost with 25c a ton added for the meal and 12½c for the hulls. The bill of lading received on the payment of the purchase draft was attached to this draft and it was deposited by S. W. Straus & Co. in the First National Bank or in Foreman Bros. Bank to the credit of S. W. Straus & Co., and they were given immediate credit on which they had power to draw and did draw checks. The pass book in which the deposits of the drafts were entered bore inside of the cover the usual printed matter, which Chicago Banks place there, to the effect that "This bank in receiving checks or deposits for deposit or for collection, acts only as your agent, and beyond carefulness in selecting agents at other points and forwarding to them, assumes no responsibility."

Charles H. Gekler was the bookkeeper and cashier of S. W. Straus & Co., at a salary from them of $25 a week. Hoffheimer, however, arranged for an additional payment to him at first of $10 a month and afterward of $15 a month, for attending to this business. This additional amount was paid by S. W. Straus & Co. and charged to Hoffheimer's account.

The entries in the books of S. W. Straus & Co. of each transaction would be, (1), a credit to the Bank

on which the check was drawn of the amount of it; (2), a debit to the Bank for the amount of the draft deposited; (3), a debit to the Union Cotton Seed Company of the amount of the check; (4), a credit to the Union Cotton Seed Company (which was but another name for Hoffheimer) for the amount of the draft, less 20 per cent of the apparent profit of the transaction; and, (5), a credit to a "commission account" of S. W. Straus & Co. of that 20 per cent of the profits. This amount was first carried into a general commission account, but afterward when the apparent transactions grew large in the manner to be hereinafter described, a separate account known as the "Union Cotton Seed Commission Account" was initiated to segregate the statement of the profits in this particular business from the other dealings of Straus & Co. It was to the account of the Union Cotton Seed Co. that the payments of additional wages of Gekler were charged.

From time to time payments were made by S. W. Straus & Co. to Hoffheimer on account of his share of the profits, by checks made payable to him individually. The entry for this on the Straus books would be a credit to the bank and a debit to the Union Cotton Seed Company. As Samuel Straus testified, transactions were "in the Banks, a transaction with the Union Cotton Seed Company, and in the office of Straus & Co., with S. N. Hoffheimer."

We have said that some of the checks given by Straus & Co. from the Fall of 1902 to July, 1903, at which last named date the transactions especially involved in this cause began, were given to the Banks holding drafts for the purchase price, with the bills of lading attached, and some to Hoffheimer. It does not, however, very satisfactorily and precisely appear in the evidence, whether any of these were deposited by Hoffheimer in the account in the National Bank of the Republic of "R. Hoffheimer," which afterward

figured so materially in these transactions. "R. Hoffheimer" was the mother of S. N. Hoffheimer, and appears, from her own testimony taken in the cause, to have known nothing of the business except that she had a bank account in the National Bank of the Republic, on which S. N. Hoffheimer had authority to sign checks.

Samuel Straus testifies, however, that he knew from the "very first transaction," some time in the fall of 1902, that Hoffheimer on account of "some financial trouble, owing some money or something of that sort," was using his mother's bank account and had none of his own, and that "he should say he knew that the checks given Hoffheimer by Straus & Co. were deposited by him in the National Republic to the credit of his mother." If that were the case, of course such drafts as were paid by Hoffheimer for the purchase money of the meals and hulls, to secure the bills of lading, were the checks of R. Hoffheimer by S. N. Hoffheimer, as were the subsequent checks in 1903-4 and 5, which took up the Union Cotton Seed Co. drafts.

The drafts and bills of lading thus deposited by Straus & Co. with the First National Bank and Foreman Bros Banking Co., practically alternately, were sent by those banks to their correspondent collection banks at the Union Stock Yards, the defendant, the National Live Stock Bank, and the Drovers Deposit National Bank, presented in due course at the offices of Nelson Morris, and paid by the check of Morris, the bill of lading being also delivered in due course to him with the draft.

Up to July, 1903, the drafts were all small, very seldom above a few hundred dollars; perhaps on a very few occasions running up to two thousand.

In July, 1903, Hoffheimer came to the Straus Brothers, and both brothers being present told them this story: That floods in the South had left on the hands of the Illinois Central Railroad Company a

quantity of damaged cotton seed, meal and hulls; that the Railroad people had sent for him and told him this, and said that they knew that he had means of disposing of the stuff; that Nelson Morris had agreed to take it, and that he (Hoffheimer) would have to get a check to take up the bill of lading for Morris. Something of this story may have been true, if the rather indefinite recollection of the Straus brothers be correct, that Hoffheimer did, on receiving the first check, bring in a bill of lading from the Illinois Central Railroad to attach to a draft on Nelson Morris; but if so, the bill of lading could not have been, at the outside, for more than a thousand dollars worth of meal and hulls— about a single carload—for the largest draft drawn during July, 1903, on Nelson Morris by the Union Cotton Seed Company was $940, on July 17th.

At all events, either on the first telling by Hoffheimer of the story noted, or on the following day, began, according to the testimony of the plaintiffs, a series of amazing frauds on the part of Hoffheimer and a two and half years season of astonishing credulity and delusion on the part of S. W. Straus & Co. For on the next day, the plaintiffs say, he told them that the Railroad Company had more of that stuff; that it would require him to pay for the bills of lading before it would deliver them, and that he therefore desired the plaintiffs to give him their check without receiving the bills of lading, and that in order to save "demurrage" (by which the witnesses using the expression apparently mean delay and not demurrage in the technical business sense of that word), he would not bring them the bills of lading from the Illinois Central Railroad (as he did from the other sellers he purchased from) to attach to the drafts on Nelson Morris, but instead would give them merely a memorandum list made out by himself of the car numbers and weights, taken from the bills of lading, which they could copy and attach to the drafts drawn on Nelson

Morris, while he took the bills of lading direct from the Illinois Central Railroad to Nelson Morris' offices. To all this the plaintiffs assented, because, as they say, "Hoffheimer had our confidence." He told them that they would get their money back quicker that way.

There is a contradiction in the testimony as it appears in the record, and a discrepancy in addition between the record and the abstract, which are somewhat confusing, about a part of the conversation or understanding between the plaintiffs and Hoffheimer as to the purchases and sales Hoffheimer expected to make after this first arrangement was made. According to the record (page 865), Simon Straus was asked whether in July, 1903, when he had this "Illinois Central" conversation with Hoffheimer, the latter told him from whom from that time forward he was buying the cotton seed meal and hulls, and answered, "No, he told us, however, that he was going to buy considerable from the Illinois Central Railroad Company. He did not say who altogether was going to purchase *from him* at that conversation." This appears in the abstract, page 186: "He told me he was going to buy considerable from the Illinois Central Railroad. He did not say he altogether was going to purchase from them at that conversation." Considering the context, it may well be that the abstract, although an incorrect statement of the record, gives more nearly the actual testimony.

But on page 895 of the Record, 194 of the abstract, the same witness is reported as testifying that Hoffheimer told him he was buying all the stuff from the Illinois Central, and on page 860 of the Record, that Hoffheimer told him that the Illinois Central "had heard that he had a number of customers that were buying the stuff, and that he (Hoffheimer) believed that Nelson Morris had agreed to take the hulls and meals."

In the abstract, page 185, the latter part of this

testimony is given as *"We"* (i. e. the plaintiffs) "believed Nelson Morris had agreed to take the hulls and meals," presumably on the assumption, which was very probably correct, that the record contained a clerical error.  Afterward on cross-examination Mr. Straus said, page 1120, that he did not understand that Hoffheimer was purchasing all his stuff from the Illinois Central Railroad Co.

But nevertheless from the subsequent transactions assuming the plaintiffs' good faith in them, it seems clear that by the plaintiffs it *was* understood, with Hoffheimer's assent, that the entire series of drafts thereafter drawn on Nelson Morris, with invoices containing memoranda of car numbers and weights and no bills of lading attached, were drawn for the sale by Hoffheimer to him of cotton seed meal and hulls purchased from the Illinois Central Railroad Company.

And this series, beginning with the first transaction in July, 1903, continued without interruption daily, except on Sundays and holidays, from July, 1903, to October 31, 1905.

At first there were also other drafts drawn in the same form, "Union Cotton Seed Company per Charles H. Gekler," and treated in the same way as between Hoffheimer and the plaintiffs, except that they had bills of lading attached, most of them (but not all) on Nelson Morris, for small amounts as compared even with those which began the "memoranda" or "invoice" series.

Answering a question on cross-examination (Rec. 894) as to how it happened that two series of drafts were running through the office of the plaintiffs from July, 1903, to January, 1904, one a series of small drafts, having actual bills of lading attached to them, and another series being for larger amounts, having nothing but the "memoranda" attached, Simon Straus said one series represented purchases from out of town houses that sold a carload or so at a time; while the

other series represented constant purchases from the Illinois Central, where the quantities were larger, and added, "That is the only explanation I could give."

Whatever was the understanding between the plaintiffs and Hoffheimer, this was the fact—that not a single one of the drafts without a bill of lading attached (but having instead annexed what Hoffheimer said was a copy of a memorandum containing the data taken from a bill of lading) was anything but a bare faced fabrication. No cotton seed meal or hulls had been purchased, as the memorandum purported to indicate, and no sale had been made to Nelson Morris or to anybody else. Nor had Nelson Morris paid one of the drafts.

The proceedings of Hoffheimer in relation thereto were simply these: Out of the fertility of his invention he would prepare each day in his own handwriting a yellow sheet of paper, containing a great number of figures in parallel columns, but nothing more. The first column was the supposed car numbers (the railroad to which they belonged not named); the second, the supposed weight in each car (approximating in varying amounts 70,000 pounds or 35 tons) of the cotton seed meal or hulls contained therein. Pencil footings were made by him to show the aggregate amount of the weights of these fictitious carloads and the purchase price thus arrived at, for which he expected to receive checks. This sheet he would, between two and three o'clock each day, bring into the plaintiffs' office in the Stock Exchange Building on LaSalle Street in Chicago, and hand to Charles H. Gekler, who at once wrote a check or checks for S. W. Straus or his brother to sign (one of them evidently must always have been present for that purpose) for the amount of the purchase price thus figured.

As we have said, for a time, although these fictitious transactions were reported at the office of Straus & Co. with great regularity, they were not the only ones

dealt with there.  Up to some time in January, 1904, actual purchases (as before July, 1903) were paid for by the Straus checks to the Union Cotton Seed Co., and drafts with bills of lading attached drawn on Morris.

But by February, 1904, the operation, which proceeded without a break until October 31, 1905, was in full swing.  No other  but the invoice or  fictitious transactions took place between Hoffheimer and the plaintiffs, and these involved each day two checks and two drafts.  Hoffheimer on his yellow memorandum sheets had divided the alleged purchases into two tabulated aggregates.  Why the aggregate amount of purchase price and of the selling price should have been thus divided does not appear in the evidence.  It was undoubtedly, however, to make easier in Hoffheimer's estimation the manipulation of his scheme.

(Hoffheimer was apparently from January, 1904, up to June, 1904, drawing other genuine drafts with bills of lading attached in the name of the Union Cotton Seed Company, to the order of the Royal Trust Company Bank, but owing to an evident mistake in making up the record by duplicating one exhibit and omitting another (pages 464 and 540 of Record, Abstract pages 114 and 129) we are unable to say with certainty in what form these were drawn and endorsed. It is a plain inference from the testimony, however, that they were not signed by Gekler nor negotiated through Straus & Co.  After June, 1904, Hoffheimer conducted his comparatively small legitimate business in selling feed to Morris in the name of Hoffheimer & Co., and the  drafts on Morris representing it were made payable to the Royal Trust Company Bank and signed ''Hoffheimer & Co., Inc., per Richard Kearney.''  Kearney was an employe of the Hoffheimer Soap Co.)

Daily, as soon as Hoffheimer had secured the two checks of S. W. Straus & Co., he hurried from their office to the National Bank of the Republic and deposited them in the account of ''R. Hoffheimer,'' his mother, dealing with the account thus augmented in

the manner hereafter to be described in the payment of drafts of the Union Cotton Seed Company on Morris already drawn and in the hands of the defendant or some other Bank at the Stock Yards for collection.

After drawing and delivering the checks to Hoffheimer Gekler would make a computation by adding to the supposed purchase price appearing on the yellow sheet 25c a ton on the meal and 12½c a ton on the hulls, and fill out two drafts on Nelson Morris with the checks, one for the amount of each of the checks with the "profit" added. These drafts were signed "Union Cotton Seed Co. per Charles H. Gekler," and being made to the order of "ourselves" were endorsed in the same way. Then the stenographer of Straus & Co. would make a copy in typewriting of the "car numbers" and "weights," add to it the memorandum of the selling price and prefix it with the date and a billhead, "Nelson Morris & Co. to Union Cotton Seed Co." Why the drafts were drawn on Nelson Morris individually and the invoices made to Nelson Morris & Co., is not explained. This copy would then be attached to the drafts, the drafts additionally endorsed specially by S. W. Straus & Co. to the order of the First National Bank or of Foreman Bros. Banking Company, according to the alternation which, as the transactions went on, became more and more regular, and then deposited by Gekler before banking hours in those banks respectively to the credit of S. W. Straus & Co. under the conditions previously noted.

When Gekler had then made the book entries, previously indicated, of the day's transactions, the business seemed to be closed so far as the plaintiffs were concerned, with a profit to themselves on their books of something more than 1-5 of one per cent of the amounts involved, and a credit to Hoffheimer of the remaining four-fifths. Under these circumstances, and as the drafts were always larger than the checks and were undoubtedly paid from the pro-

ceeds of the checks of the subsequent day, and the alleged transactions, so far as Hoffheimer was concerned, were all fictitious, it perhaps might be expected that as long as the scheme lasted and until the end came by some successful flotation of the Soap Company or of some other enterprise of Hoffheimer's, or by his ignominious exposure, the daily amounts of the drafts would increase.   But it was not to be expected, one would think, that they would increase as they actually did.   The entire amount of them was something over twenty-three millions of dollars.

On a rough estimate it may be said that in July, 1903, they averaged only $700 a day; in January, 1904, they had reached $5,000 a day; in July, 1904, they averaged $6,000 daily; in January, 1905, $30,000; in February, 1905, $36,000; in March $45,000; in April $50,-000; in May $60,000; in June $80,000; in July $100,-000; in August $120,000; in September $140,000, and in October $160,000.   It is difficult to realize what these daily amounts of money meant in bulk and weight of the meal and hulls.  . They represented an increase in the daily supply to one cattle feeder of a particular kind of feed, from thirty tons to something approaching seven thousand and from one carload a day to almost two hundred, a number which would have necessitated the making up of several trains.

During all this time, the testimony of the plaintiffs is that they entertained no suspicion of anything irregular or strange in the transactions, and made no inquiries of and had no conversation with anybody but Hoffheimer about the purchases and sales.

Simon W. Straus testified that there were certain seasons—a certain part of the year before July, 1903—in which he knew Nelson Morris did not buy cotton seed meal, but seems to have lost sight of that after July, 1903.   He says the plaintiffs had implicit confidence in Hoffheimer and believed every word he told them.   Hoffheimer said, "Morris was getting more

cattle," "always would give some plausible reason."

Straus, testifying that he never made any inquiries by telephone or otherwise from the Illinois Central Railroad or the Morrises as to the genuineness of the drafts, added, "Why should we? We always got our money."

The plaintiffs, or more accurately the Banks, the First National and Foreman Bros. Banking Company, in which the plaintiffs deposited the drafts, did always get their money (paid, however, by the certified checks of R. Hoffheimer) on this series of drafts from July, 1903, to October 31, 1905, when, for some reason not clearly disclosed by the record, the machinery ceased to work. It appears, however, from the record that on October 28, 1905, which was Saturday, there were two checks on Foreman Bros. to the order of the Union Cotton Seed Company, given to Hoffheimer in the Straus office for $79,919 and $84,091.75, respectively. Drafts were drawn corresponding to them for $80,-718.19 and $84,932.67. These drafts were deposited that day in Foreman Bros. Bank and undoubtedly reached the National Live Stock Bank for collection on Monday, the 30th. The one for $80,718.19 was evidently taken up that day, and the one for $84,932.66 carried over until the next day, according to the arrangement previously made, which we shall hereafter mention. On Monday, October 30th, checks were drawn by S. W. Straus & Co. on the First National Bank for $79,767.38 and $84,585.05, and corresponding drafts for $80,565.05 and $85,439.84 deposited in that Bank to the credit of S. W. Straus & Co. These drafts reached the National Live Stock Bank on October 31st, and therefore, on that morning, there were three drafts in the National Live Stock Bank for collection; the one from Foreman's Bank of October 28th for $84,-932.67, and the two from the First National Bank of October 30th for $80,565.05 and $85,439.84.

The draft from the Foreman Bros. Bank of October

28th for $84,932.67, and the one from the First National of October 30th for $80,565.05, were paid on October 31st by check of R. Hoffheimer for $165,-497.72, (Rec. p. 622) to the National Live Stock Bank, and if the course of proceeding theretofore pursued had been followed, the other from the First National Bank of $85,439.84 would have been carried over until the next day, Wednesday, November 1st. But this did not happen. · There must have been some departure from the usual course, if the recollection of Mr. Wetmore of the First National Bank is correct, that he was advised on October 31st that this draft had not been paid. (Rec. p. 164). He notified Mr. Straus of its nonpayment, and Mr. Straus came in and paid the amount of it (for which of course he was liable as endorser) to the First National Bank before it came back from the National Live Stock Bank. Presumably this was during banking hours of Wednesday, November 1st. Mr. Wetmore had, on learning of its non-payment, telephoned instructions to the Live Stock Bank to hold it for orders, and it was transmitted to the First National Bank by letter of November 2nd.

But meanwhile, on Tuesday, October 31st, the usual proceedings had taken place in the Straus offices. A check of S. W. Straus & Co., of that date, for $85,814.72 (Rec. 769, Abst. 169), and another for $79,729.38, both on Foreman Bros. Banking Co. (the latter we find on page 349 of the Record, but not in the Abstract, except in the index of exhibits), to the order of the Union Cotton Seed Co., had been given to Hoffheimer and by him endorsed in the usual way and deposited in the account of R. Hoffheimer & Co. in the National Bank of the Republic. It was from the proceeds of these checks that he was enabled on that day to pay to the National Live Stock Bank two of the three drafts which they held for collection on that day, as hereinbefore stated. But the corresponding drafts of October 31st for $86,693.25 and $80,526.68 (with the fictitious in-

voices in due form appended), which were deposited in Foreman Bros. Bank on that date, and reached the National Live Stock Bank on Wednesday, November 1st, were, like the draft for $85,439.84 of October 30th, which came from the First National Bank, not paid. The "explosion," as it was termed during the trial below, had come, and the account of "R. Hoffheimer" had in it on November 1st only $156.27.

Although the two drafts of October 31st were not actually returned to the Foreman Bros. Banking Co. until November 2nd, the notification to Straus Bros. on November 1st and the requirement of the First National Bank, which was complied with, that the unpaid draft of October 30th must be taken up by them, must have become known to Hoffheimer on the morning of November 1st, for he intermitted the visit to the office of Straus & Co., which had been a daily occurrence for two years and a half, and both the Straus Brothers were looking for him from some time before two o'clock in the afternoon until six. Richard Kearney, a material witness for the defendant on a point to be hereafter alluded to, saw Mr. Straus in an excited condition looking for Hoffheimer at about four o'clock in the afternoon of November 1st.

It may be noted that although the testimony of the collection clerk at the National Live Stock Bank (Rec. 1600) is that on November 1st, "when he had not received a check at the usual time," he notified the First National Bank of the non-payment of the draft of October 30th, as well as Foreman Bros. of the non-payment of those of October 31st; the inference from the rest of the evidence is very plain that before then something unusual had happened as to this draft, and that the First National Bank knew by October 31st that it had not been and was not likely to be paid at the Stock Yards.

Samuel Straus testified that when the three drafts were returned, S. W. Straus & Co. paid them (aggre-

gating $252,659.77) to the First National Bank and Foreman Bros. Banking Company, respectively, and the plaintiffs claim that they are losers to this amount, with interest, by these fraudulent transactions of Hoffheimer, less only $7,297.27, which they have been able to collect from him. This estimated loss, therefore, which they reckon at $270,153.45 (Rec. 935), includes their supposed profits on these fictitious deals as well as interest. For this loss they claim the defendant is liable to them because of its alleged deceit or negligence, or both, in the process of the collection of drafts connected with these fraudulent transactions between July, 1903, and November, 1905.

We turn, therefore, now to the facts in relation to the payment of these "invoice" drafts.

They were at first, so far as all the banks into whose hands they went are concerned, handled exactly like the similar drafts of the Union Cotton Seed Co., which had bills of lading attached. They were sent by the First National Bank and Foreman Bros. Banking Company to their correspondents at the Union Stock Yards for collection. The First National Bank between July, 1903, and August, 1904, sent almost 250 Union Cotton Seed Co. drafts, out of about 500 received, to the Drovers Deposit National Bank for collection, and the rest to the National Live Stock Bank.

The Foreman Bros. Banking Company sent most of those received by it to the National Live Stock Bank, but as late as December, 1904, sent two of the invoice drafts to the Peoples Trust & Savings Bank.

A comparison of the drafts of the "Union Cotton Seed Co." with bills of lading attached, paid by Nelson Morris (Rec. 473) (and the evidence is that none without bills of lading were paid by him or by his check), and those sent to the Drovers Bank for collection (Rec. 446), shows that five only of the 230 and more of those so sent were of the "genuine" as distinguished from the "fictitious" series; and yet the

entire lot were paid and paid at the "Morris offices" after presentation there by the collection clerk of the Drovers Bank. The method of collection used by that Bank has already been described. The evidence leaves no doubt in our mind that these drafts were left with the others on the. Morris concerns from various parties, with Bell, the draft clerk of Morris, that 230 drafts of this particular "invoice" series were paid there to the Drovers Bank clerk by "R. Hoffheimer's" certified checks, either by Hoffheimer himself or by James A. Bell, the Morris cashier, who would occasionally hand the Hoffheimer check to the Bank collector and some times apologize for or explain Hoffheimer's absence. Hoffheimer's intimate connection with and continued presence in Morris' offices rendered it possible for him there to await the presentation of these drafts, but he must have ●had, to render him able to meet them as he did with the "R. Hoffheimer" checks, the assistance and aid of Bell, who may possibly, in those comparatively small beginnings of the "business," have supposed it to be some "deal" in which Morris and Hoffheimer were interested, of which, however, he knew nothing and with which he had no interest further than to accommodate Hoffheimer. The only alternative to this is to suppose a less innocent knowledge on his part.

But the necessity to be present in the Morris offices when drafts were presented and to secure the active assistance or aid of anybody in the Morris offices, must have become, if not impossible, exceedingly difficult and irksome to Hoffheimer as the fraudulent business developed into its huge proportions; and Bell testifies that at some date he cannot remember he warned "Hoffheimer to discontinue drawing the drafts on Nelson Morris." This, however, like much of his testimony, is very indefinite.

We have noted the manner, differing from that of

the Drovers Bank, in which the National Live Stock Bank treated the drafts on the Morris concerns received by it for collection.

It sent them over to the offices twice a day and there left them, trusting to their return to the Bank, with due reports, later in the same day. Manifestly this was for Hoffheimer a safer course for the "invoice drafts" to take. Those of them that had come to the National Live Stock Bank had been thus sent over with the other Morris drafts, but had been brought in with "R. Hoffheimer" checks to pay them later than the ones which were paid by the check of Nelson Morris. The same messenger, during the first five months of the series of invoice drafts, according to the testimony of Kendall, the collection clerk of the National Live Stock Bank, brought the "R. Hoffheimer" check for their payment, that brought the "Morris" check for the other Morris drafts, and was supposed by Kendall to be in the employ of Morris. There is no reason to doubt this, considering the way that Bell treated the Drovers Bank drafts of the same kind. It was only of the later time of the business in 1905, when the drafts had become enormous, that we know from the evidence that a different messenger brought the checks—a messenger coming direct from Hoffheimer's down town office, and not from the Morris offices.

Had either party put Hoffheimer on the stand, perhaps something more of the proceedings in the earlier part of the transactions might have been disclosed; but he was not produced.

It was manifestly easier for Hoffheimer, with the run of the Morris offices that he plainly had, to look at his leisure over the drafts there left, pick out the ones which he was concerned to see taken up, and send a messenger from the Morris offices (perhaps paying him as he paid Gekler), than to await in the Morris offices the collection clerk of the Drovers Bank and

personally give him a check. It became, therefore, Hoffheimer's concern to secure the transmission of all the "invoice" drafts to the National Live Stock Bank, and this he undertook to do in the late summer, or early fall of 1904. It was his first attempt to change the course of procedure before adopted. He went to Simon Straus and told him that Nelson Morris would prefer to have the drafts all sent through the Live Stock Bank, with which he did all his business. Simon Straus accepted the suggestion at once and went to Wetmore of the First National Bank and to E. G. Foreman of the Foreman Bros. Banking Company, and made the necessary request, which was complied with, except that by mistake two of these invoice Union Cotton Seed drafts, one on December 29, 1904, of $14,394.25, and one on December 30, 1904, of $14,842.94, were sent by Foreman's Bank to the People's Trust & Savings Bank at the Stock Yards. The one of December 29th was sent by that Bank to the Morris office on the 30th by a messenger. The messenger there saw Bell, who told him to wait awhile. After waiting half an hour Bell gave him a check. Although the description of the check could not be recalled by the messenger, it was undoubtedly a "R. Hoffheimer" check, for no such draft was paid by Nelson Morris or by Nelson Morris' check. On the 31st of December the draft of December 30th arrived at the People's Bank for collection. Because of the delay on the day before, the cashier telephoned Mr. Bell at the Morris office, and told him that a draft on Morris for $14,842.94 by the Union Cotton Seed Co. had been received. Mr. Bell told the cashier to hold the draft until later in the day and he would send a man over to take it up. In the afternoon a man, unidentified, but answering the general description of Hoffheimer, came over to the Bank and presented a certified check on the National Bank of the Republic in payment. The cashier could not otherwise describe the check, but

there can be no reasonable doubt that it was, like the others, a "R. Hoffheimer" check.

All the other "invoice" drafts were sent to the National Live Stock Bank, but at about the same time as, pursuant to the instructions noted, they began to be all sent to the National Live Stock Bank, a change was made in the method of handling them by that Bank. Instead of being sent to the Morris offices, with the other Morris drafts, they were held by the National Live Stock Bank and taken up each day by a young man who brought a certified "R. Hoffheimer check" to pay them.

The occasion of this change is one of the few disputable and disputed matters of fact in the case. Kendall, the collection teller of the National Live Stock Bank, testified that he received a telephone message from Bell (the Morris cashier), whose voice he recognized, asking him to hold "the large Union Cotton Seed Co. drafts at the Bank, as they would be taken care of separately and it would be more convenient to handle them that way." To this he assented, and the two drafts of that day, which had been sent with the other Morris drafts to the Morris offices, were shortly after returned unpaid to the Bank by the Morris messenger. Later in the day, however, another messenger appeared with a "R. Hoffheimer" certified check and took up the drafts.

Bell testified that he never had this telephonic conversation with Kendall, and in the absence of any corroborating testimony, it may be assumed that Bell's identification as Kendall's interlocutor was not satisfactorily proven. But there is, in our mind, no reason to doubt that through Hoffheimer's agency such a conversation between Kendall and some person at the other end of a telephone wire occurred, and that it was represented to Kendall that it was the wish of the Morris office that the "invoice" drafts should be held at the Bank and not sent over with the other   Morris

drafts. Nor is there any doubt that Kendall later reported the alleged conversation to Mr. Ryther, the cashier, and to Mr. Flynn, the President of the National Live Stock Bank, and received their approval to the assent which he had given to the request.

Shortly after this Hoffheimer began daily to call up Kendall from the office of the Soap Company down town, and ask the amount of the Union Cotton Seed Co. drafts on that day in the Bank. Kendall would answer, giving the amount, and thereafter a messenger would arrive at the Bank with a certified check of R. Hoffheimer on the National Bank of the Republic for the said amount and take up the drafts. This continued until the culmination on October 31, 1905. The testimony of the stenographer of the Soap Company and the other Hoffheimer business is to the effect that from August to November, 1905, she made the telephone call for this purpose, and put Hoffheimer on the wire; that he took down figures and wrote out a check. And the testimony of the office boy of the Soap Company shows that from May, 1905, to October 31st, he daily met Hoffheimer at the National Bank of the Republic just before three o'clock, where Hoffheimer would make a deposit and have a check certified, and give it to him. The witness would then proceed directly to the National Live Stock Bank by the street cars, taking about thirty minutes in the transit, pay over the check to the collection teller, receive the drafts stamped "Paid" and bring them back to the Hoffheimer offices, where they would be put in a drawer with others.

In the Spring of 1905 the fraudulent transactions of Hoffheimer had become so large that he needed more margin —elbow room, so to speak—to manipulate them, and he made another change in the arrangements. He made to the Strauses the request, as though coming from Morris, that one of the two Union Cotton Seed Co. drafts coming to the National Live Stock Bank

each day should be held over until the following day, to give a better opportunity for "checking up," and Simon Straus at once conveyed this request to the National Live Stock Bank through the First National and Foreman Bros., and it was agreed to.

(There is much uncertainty in the testimony of the Strauses as to when the requests to have the drafts all go to the National Live Stock Bank, and to have one draft held over, were made by Hoffheimer, both absolutely and relatively to each other; but an analysis of the exhibits shows that the recollection of E. G. Foreman and of the chief clerk of the Foreman Bank was correct, that the first was made in the Summer of 1904, and the second in the Spring of 1905. Up to July 30, 1904, as many of the drafts had been sent to the Drovers Bank by the First National as to the Live Stock. After July 30, 1904, only one was so sent. And the dates of payment of the drafts sent by the First National compared with the dates of the drafts show that it was on April 27th, 1905, that one of the drafts was first held over.)

It is upon these facts that the plaintiffs rely to establish their cause of action set out in their declaration. Because without their knowledge the defendant, the National Live Stock Bank, at all times received the certified check of "R. Hoffheimer" in payment of these drafts, and because after September, 1904, the defendant did not present the drafts at the office of Morris, but held them at the Bank, still receiving the Hoffheimer checks therefor, the plaintiffs allege that they were by the deceit or negligence, or both, of the defendant damnified and should recover.

It is vigorously argued on the part of the plaintiffs that the evidence shows that the defendant, through its agents and employes, knew, or ought to have known, that Hoffheimer was in fact the drawer of the draft, and not the representative in any sense of the drawee, the legitimate inference from which would be that he was engaged in a fraud.

We have carefully considered the record in the light of this claim, but fail to find that there is any material evidence that Kendall or anybody else in the defendant Bank knew that the Union Cotton Seed Company was a name under which Hoffheimer was conducting business, or that Hoffheimer was the real drawer of drafts uniformly signed "Union Cotton Seed Co., per Chas. H. Gekler." The knowledge of this state of affairs was the plaintiffs', not the defendant's, as the knowledge, according to the plaintiffs' testimony, that the drafts were being paid by "R. Hoffheimer" check, was the defendant's and not the plaintiffs'.

Probably could these pieces of information have been exchanged, the deplorable result might have been averted.

That the drafts were suspected by the Bank officials to be "involved" with "some brokerage deal" between Hoffheimer and Morris, is far from necessarily sustaining the inference that they knew that Hoffheimer was the Union Cotton Seed Co. instead of being interested in some other manner in the transactions which might have justified him in paying the drafts.

But if the amount and continuity of the transactions are considered, it certainly does seem strange that suspicion of something irregular did not creep into the minds of all the persons cognizant of them, first and chiefly, however, into those of the plaintiffs.

The disputable matters in the case were all alleged by way of defense. Besides the one already indicated concerning the alleged conversation between Bell and Kendall as to holding the drafts at the Bank, we find but two in the record deserving notice. They both relate to an inference claimed by the defendant to be justified, that the plaintiffs did know or suspect before the "explosion" came that there was irregularity in the matter. One is the matter of a conversation between Mr. Wetmore of the First National Bank and

Straus v. Nat. L. S. Bk., 163 Ill. App. 310.

Mr. Simon Straus about the middle of October, 1905. Mr. Wetmore says he requested Mr. Straus to furnish the bank with a guaranty of Nelson Morris on the drafts—not an unreasonable request considering that the Bank was taking daily from S. W. Straus & Co. drafts for over a hundred and fifty thousand dollars. Mr. Wetmore says that he had marked the drafts as acceptable for deposit and credit, on the credit standing of the endorsers. The amounts were evidently becoming larger than Wetmore estimated was a fair credit risk, hence the inquriy. Mr. Straus testified also to the inquiry, but as to the answer given by him he and Wetmore are in contradiction. Wetmore says that Mr. Straus said that "this business was of a confidential nature and that the guaranty could not be had." Mr. Straus says that his answer was that "Our relationships were not confidential or close enough to Mr. Morris to ask him to guaranty the drafts."

Whatever the answer was, Mr. Wetmore says he became "a little suspicious of the integrity of the drafts after that." This may have led to actions on his part precipitating the disclosure on October 31st.

The other disputed matter referred to was a conversation on November 1, 1905, sworn to by Mr. Richard Kearney, an employe and an officer of the Soap Company. Kearney says that Simon Straus came in an excited condition to the office of the Company at four o'clock in the afternoon, looking for Hoffheimer; that he asked if "Sam," meaning Hoffheimer, was there, and then asked Kearney if he knew whether "Sam took up the drafts." On Kearney's answering that he personally had taken up drafts for feed for three or four hundred dollars, Straus said, "I don't mean those drafts; I mean the drafts that Sam takes up." Straus testified he "did not ever in any conversation with Kearney refer to the Union Cotton Seed Company drafts as 'drafts that Sam takes up.'"

Whatever the truth may be as to these conversations, it is not claimed that there is any evidence in the record showing any motive for the transaction of this business by the Strauses on the hypothesis that they knew the drafts were fictitious.

We have thus at length detailed material facts and questions of fact appearing in the record of almost two thousand typewritten pages, for we think the disposition of the case must turn on them. Our conclusion is that not only was the verdict not contrary to the evidence, but that upon that evidence no other verdict was possible; not only that the evidence was not sufficient to support the action, but that there was no evidence sufficient to warrant the refusal to give the peremptory instruction asked for the defendant.

It is not necessary, in our view, that it should be assumed that any of the disputed matters of fact were established in favor of the defendant's contention, to warrant this conclusion. On such an assumption, however, we cannot see that even a plausible ground of contention remains. If Bell did request Kendall, who represented the defendant Bank in the matter to hold the "invoice" drafts at the Bank and they would be taken care of there, it certainly is neither evidence of "deceit" nor of "negligence" that it so held them, nor that it took the "R. Hoffheimer" checks in payment.

Bell was, to all legal intents and purposes, in these transactions, "Nelson Morris," on whom the drafts were drawn. Morris was interested in many concerns. The Bank knew that, but could hardly be held to know what they all were. In the absence of knowl-

edge that his nephew, S. N. Hoffheimer, was the "Union Cotton Seed Co.," the Bank was no more to blame under such instructions for holding drafts on "Nelson Morris, Esq." at the Bank and taking "R. Hoffheimer" checks in payment, than it would have been for holding them and taking for them the checks of "Nelson Morris & Co." an entirely different entity from "Nelson Morris." No one would in such a case probably have accused the Bank of dereliction of duty.

And if only one of the other disputed matters were decided against the plaintiffs' contention, especially the alleged question of Simon Straus to Kearney, there would be established a knowledge by the plaintiffs of the irregularity of Hoffheimer's transactions, which added to their manifest carelessness and negligence throughout, would seem to render a claim of damnification by the procedure of the Bank futile.

But on the assumption that the plaintiffs are accurate in their version of the Kearney and Wetmore conversations, and that Bell tells the truth in saying that he never gave Kendall the instructions which Kendall says came to him in the voice that he says he recognized as Bell's, we are still of the opinion that there is no evidence in the case warranting a verdict and judgment for the plaintiffs.

Essential element to warrant such a result—knowledge on the part of the Bank that Hoffheimer was in any sense the drawer of drafts signed "Union Cotton Seed Company per Charles H. Gekler"—is wanting in the evidence. Gekler's connection with Hoffheimer could not be known to the Bank. He was the clerk of the plaintiffs. The appearance of anything suggesting Hoffheimer's connection with the drawer seems to have been solicitously guarded against in the signature.

On the other hand, many things might well be thought to indicate to the Live Stock Bank and its agents a connection between Hoffheimer and the drawee of the draft. Their relationship, the fact that

for years Hoffheimer had been an important and trusted employe of Morris, and that he still retained an intimate familiarity with his offices, above all the fact that precisely similar drafts had been sent to Morris' offices by the defendant with the other Morris drafts for many months and had been brought back from there and paid with a ''R. Hoffheimer'' check, might well be considered a sufficient excuse, if excuse were needed, for holding the drafts at the Bank, even if Hoffheimer himself had been known to be the person requesting it, and for accepting from the person bringing them the certified ''R. Hoffheimer'' checks which paid them.

The essential duty of a collecting bank after all must be to obtain payment if possible on the items it receives. The cases in the plaintiffs' argument, which we shall not undertake to discuss in detail, relating to the duty of such banks to present drafts to the drawee promptly, treat of that duty as a means to the end sought. If non-payment and loss by reason of such non-payment occur on account of such non-presentation, of course the Bank is liable. And in the present case, supposing that there had been no fraud, that the drawee had known the facts and desired that the drafts should be handled in the way they were, and that non-payment and a consequent loss by some combination of circumstances had occurred to the Banks sending the drafts for collection (and which had received and treated them as cash so far as giving credit to their depositor was concerned), by reason of a refusal by defendant to take the payment offered, the defendant would have been responsible and liable for such loss.

Much stress is laid in plaintiffs' argument on the fact that some of the letters of remittance to the Banks in Chicago which had thus received the drafts on deposit, referred to these drafts as ''Morris'' items. It is urged that this was an affirmative representation that Morris himself had paid them. We do not so

consider it. The note was one of identification, merely, not of representation. Nor do we think that the testimony, taken together of Wetmore concerning the natural presumption of payment by the drawee lends any force to the position taken, that actual deceit or wilful concealment can be predicated of the actions of the defendant in relation to the presentation, collection and remittance of these drafts.

And, as we have said, we are no better satisfied that any negligence of the defendant was proven sufficient to render it liable to any one for the loss that occurred through the fraudulent conduct of Hoffheimer.

On a general and broad theory of the law rather than on any special doctrine pertaining to negotiable paper, there would have been a duty on the collecting Bank, had they had good grounds (through what happened or became known to them in the handling of these drafts), for believing that a fraud was being carried on, to have made known those grounds to their principals, and a neglect to do so might have rendered them liable to those principals, Foreman Bros. Banking Company and the First National Bank, for a loss accruing to those Banks thereby. We do not, however, think that reasons for such belief sufficient to show that the defendant neglected a general duty to its principals, have been proven in this case.

Beyond that, however, and without questioning or discussing the theory of plaintiffs, that the relation of principal and agent in this case existed not merely between the First National Bank and the Foreman Bros. Banking Company on the one hand and the defendant on the other, but between the plaintiffs and the defendant as well, there is an element not to be ignored introduced by the admitted facts into this controversy between the plaintiffs and the defendant by what we cannot but characterize as gross negligence on the part of the former. If the defendant was in any sense negligent, the plaintiffs were greatly more so,—so neg-

ligent, in our opinion, as to make it impossible for reasonable men to come to any other conclusion than that their negligence resulted in their loss. In such a case the existence of negligence, contributory or primary, becomes a matter of law for the court and not of fact for the jury. Heimann v. Kinnare, 190 Ill. 156; Railway Co. v. Liderman, 187 Ill. 463.

We should be slow to make, in a case of commercial transactions like this, a drastic application of the rule concerning "contributory negligence" as that term is used in the law of liability for personal injuries, and unwilling to accept it, as in some of the instructions in this case it seems to have been accepted, as furnishing a defense to the wilful deceit of a defendant resulting in loss to a merely contributorily negligent plaintiff.

But the law undoubtedly is that where the loss of the plaintiff is primarily due to his own neglect, credulity and carelessness, he cannot recover against a defendant who may have been guilty also of some neglect of duty contributing to the result. What Judge Story said in Bend v. Hoyt, 13 Peters 263, cited by the defendant, may also be said in this case:

"The error * * * has arisen from the plaintiff's own culpable negligence and courts of justice do not sit for the purpose of aiding those who seek redress for supposed mischiefs resulting from such negligence. Even courts of equity will not interfere to assist a party to obtain redress for an injury which he might, by ordinary diligence, have avoided, and a *fortiori* a court of law ought not, where the other party has by the very acts or omissions lost his own proper rights or advantages."

And the Supreme Court of this State in Bartlett vs. The First National Bank, 247 Ill. 490, denied recovery in a commercial transaction to one whose negligence in it was gross, although except for that consideration the defendant would have been liable. (p. 497.)

In the case at bar the plaintiffs placed implicit confidence in Hoffheimer's word, and made no inquiries which would have revealed the truth. Yet there were many suspicious circumstances; for example, the improbability of Morris allowing such profits in transactions of such magnitude for what were practically mere broker's services; the improbability of the Illinois Central alone having so much meal and hulls so continuously on hand; the improbability of any such quantities being wanted under any circumstances by a single feeder; the improbability of the daily occurrence of such purchases; the increase to such an astounding extent of the transactions, and increase so rapid and yet so regular; the appearance of Hoffheimer in the plaintiffs' offices always just before banking hours closed each day; the doing of all this immense business by him under a mere trade name without the appearance of his own, and the use in it of a bank account of his mother, instead of one of his own, through which to pass $23,000,000, and this under the plea of financial difficulties. It was for the plaintiffs to notice these things, not for the defendant, who had the drafts only for collection, nor for the Banks which took them in the regular course of business on the credit of their customer, who was the last endorser. But not only did the plaintiffs ignore these matters, but they took no note of what would to most men have been warnings, in the inquiries indicating suspicion which were made of them by the officers of the National Bank of the Republic as to their knowledge that Hoffheimer was regularly and daily depositing their immense checks in his mother's account, and by Wetmore of the First National Bank as to the desirability of Morris' guaranty.

We think that on the evidence in the case, the peremptory instruction asked for the defendant at the close of all the evidence should have been given, and the case taken from the jury. As this is our conclusion,

we deem a discussion of the errors in the instructions complained of by the plaintiffs unnecessary. The instructions are in some particulars, in our opinion, plainly erroneous. We have indicated already our disagreement with the doctrine which more than one of them contains of the effect of contributory negligence in an action for fraudulent deceit, where there is evidence to sustain the charges of such fraud. Some of them would be objectionable if the negligence of the plaintiffs on the whole case had not been so proven as to make it a matter of law, in declaring certain particular matters such negligence.

But as we hold that the evidence did not tend to show either in the transactions involved deceit or actionable negligence on the part of the defendant, and did so show gross negligence on the part of the plaintiffs as to prevent reasonable men from coming to a conclusion that it did not exist, and as a consequence hold that the jury should have been instructed to return a verdict for the defendant, all discussion of the instructions in detail would be merely academic.

The rulings on the admission and exclusion of evidence stand on a different footing, but we do not consider that they contain any reversible error.

The one most vigorously complained of is concerning the treatment by the Drovers Deposit National Bank of a great number of that series of drafts which are involved in the litigation. We think it correct, not because it matters whether, if the National Live Stock Bank was guilty of anything which makes it liable, the Drovers Bank was also so guilty, but because it is essential to the rightful decision of this cause, under the plaintiffs' own theory, to know whether at the office of the "Morris" concerns there had been notice that such drafts as these had been drawn, and were being paid by "R. Hoffheimer" checks. The theory of the plaintiffs' alleged cause of action is their damnification by the withholding of this knowledge from the Morris

offices.   The same consideration governs the admission
of the evidence about the drafts presented through the
People's Bank.   If the Morris offices knew of these
drafts, the plaintiffs were not damnified by the defend-
ant's withholding information of them.

Nor do we think the fact of conversations between
Kendall and the cashier and president of the National
Live Stock Bank in relation to the handling of the
drafts incompetent or immaterial.   The good faith of
Kendall and of the representatives of the defendant
Bank generally was made an issue by the plaintiffs.
The occurrence of these conversations threw light on it.

The refusal to admit proof of the conversation be-
tween Bell and Hoffheimer, of which the plaintiffs com-
plain, is not material.   Perhaps no harm would have
resulted from a more liberal treatment of the offer,
but it certainly is not reversible error.   The questions
at issue were not what Bell told Hoffheimer, but what
the defendant had a right to infer from the course
of the transactions concerning these drafts between the
Morris offices and the Bank, and whether or not the
Morris offices had notice that drafts of this series had
been drawn.   And Bell was allowed to testify, alluding
to the "invoice" drafts of the Union Cotton Seed Co.
(Rec. 1714), that "he told Hoffheimer to discontinue
drawing the drafts on Nelson Morris."

If there was any error—a very doubtful proposition
—in refusing statistics of the cotton seed meal and hull
production and of the number of neat cattle in the Uni-
ted States, authenticated, as those offered were, it was
immaterial.   To our minds it would have heightened
rather than diminished the suspicious character of the
proposed transaction of October 27, 1905 (Rec. 878),
to show that on one day a single feeder of cattle was
supposed to have bought of one man about one two-
hundredth part of the entire production of cotton seed
meal and cake in the United States for a year (Rec.
1233), when that fact was to be connected with the

proof already made, that he had been supposed to have bought each day for weeks before almost the same amount and for five months before more than half as much each day.

The evidence would not have tended to improve the plaintiffs' case had it been admitted.

The judgment of the Superior Court of Cook county is affirmed.

*Affirmed.*